**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**JOHN SCOTT EMIDY,
Individually and on behalf
of those similarly situated,**                                                          **PLAINTIFFS**

**V.**                                                                          **CIVIL CASE NO.: 2:19-cv-2671**

**JUUL LABS, INC., ALTRIA GROUP,
INC. and PHILIP MORRIS USA, INC.**                                         **DEFENDANTS**

## CLASS ACTION COMPLAINT

### JURY TRIAL DEMANDED

Plaintiff, **JOHN SCOTT EMIDY**, individually and on behalf of the Class set forth below,

(" Emidy" ) brings this his Class Action Complaint against Defendants JUUL Labs, Inc. (" JUUL" ),

Altria Group, Inc. (" Altria" ), and Philip Morris USA, Inc. (" Philip Morris" ), on behalf of himself

and those similarly situated, and alleges as follows:

### INTRODUCTION

1.           Emidy is 25 years old and addicted to an e-cigarette hereinafter referred to as

"JUUL product."   Health authorities consider youth e-cigarette use an epidemic. Mimicking Big

Tobacco's past marketing practices, Defendants prey on youth to recruit replacement smokers for

financial gain. Altria recently acquired a 35% stake in JUUL which is the country's lead e-

cigarette seller. Altria also owns Philip Morris, which sells Marlboro, the country's most popular

cigarette. Now that JUUL has Altria's infrastructure, progress in nicotine cessation stands to

erode. Defendants use fraudulent and deceptive youth marketing business practices. They exploit

themes that resonate with teenagers while falsely denying doing so.   Plaintiff brings this lawsuit

to redress the harm already sustained and to prevent future harm to others.

  2. Tennessee prohibits the promotion of merchandise through false, deceptive or misleading advertising.

  3. At all material times, each Defendant engaged in unfair methods of competition and unfair, deceptive and fraudulent acts or practices including deceptive advertising in violation of Tennessee law, with regard to tobacco trade and commerce including the JUUL products identified herein including, but not limited to, the following:

- Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of JUUL products;

- Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with or certification by another;

- Representing that JUUL products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that they do not have;

- Representing that JUUL products are of a particular standard, quality or grade, or that JUUL products are of a particular style or model if they are of another;

- Advertising JUUL products with intent not to sell them as advertised;

- Engaging in conduct which creates a likelihood of confusion or misunderstanding;

- Acting, using and employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of the JUUL product; and

- Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast, statements and representations with regard to the sale of JUUL products, which are false, misleading and deceptive and which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.

4.    At all material times, each Defendant was acting by and through their respective subsidiaries, subordinates, agents and/or employees and, as such, is responsible and liable for all such actions under principals of vicarious liability including, but not necessarily limited to, respondeat superior, master/servant and principal/agency.

## PARTIES, JURISDICTION AND VENUE

5.    Plaintiff, EMIDY resides in Collierville, Tennessee and is an adult resident citizen of the State of Tennessee.  Plaintiff, EMIDY brings this action individually and on behalf of the Class set forth below (hereafter collectively " Plaintiff" ), who were and are directly and proximately harmed by Defendants' unlawful conduct as alleged in this Complaint.   Such harm includes exposure to significant toxic substances; nicotine addiction; and economic harm.

6.    Defendant JUUL is a Delaware corporation, having its principal place of business in San Francisco, California.   JUUL manufacturers, designs, sells, markets, promotes and distributes JUUL e-cigarettes.

7.    Defendant Altria is a Virginia corporation, having its principal place of business in Richmond, Virginia.

8.    Defendant Philip Morris is a wholly-owned subsidiary of Altria.   Philip Morris is a Virginia corporation, having its principal place of business in Richmond, Virginia.

9.    Altria and Philip Morris are sometimes referred to collectively in this Complaint as the Altria Defendants.   Altria acquired 35% ownership in JUUL to, among other things, sell, promote, market, and distribute JUUL e-cigarettes.   Pursuant to a services agreement, JUUL will have access to Altria Defendants' industry infrastructure.

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

3

§ 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     The Court has personal jurisdiction over all Defendants because they do business in the Western District of Tennessee and have sufficient minimum contacts with the District. Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, and sale of tobacco products including JUUL products at issue in this lawsuit to render the exercise of jurisdiction by this Court permissible under Tennessee law and the U.S. Constitution.

12.     Venue is proper in the Western District of Tennessee pursuant to 28 U.S.C. § 1391 (b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in the District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## GENERAL FACTUAL ALLEGATIONS

### The E-Cigarette Epidemic

13.     According to the CDC, about 4.9 million middle and high school students were current users of a tobacco product in 2018, meaning that they used such products within the past 30 days. This represents an increase of 1.3 million users just since 2017.[1]

14.     The FDA has described the increase in e-cigarette consumption as an "epidemic."

---

1 See https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html .

15.     This epidemic is driven by Defendants' illegal conduct, which it based on decades of research by the tobacco industry about how to manipulate nicotine to maximize addiction and how to market tobacco products to youth. Tobacco industry documents became available to JUUL's founders because they were ordered to be made public in 1997 through the Master Settlement Agreement between dozens of states' attorneys general and the largest U.S. cigarette manufacturers. When the tobacco industry continued to violate the settlement by marketing to minors, a federal district court issued a RICO judgment in *U.S. v. Philip Morris* and Congress enacted of the Family Smoking Cessation & Tobacco Control Act of 2009, which imposed additional restrictions on youth advertising and banned flavored cigarettes.

16.     With JUUL products, JUUL's founders set out to reinvent the cigarette to an e-cigarette model as a "luxury" product that had broad consumer appeal. Using tobacco industry documents made available in the tobacco litigation as a playbook, JUUL recreated the industry's well-honed (and subsequently banned) methods to seduce new smokers, by using candy-like flavors and advertising that exploited the psychological vulnerabilities of adolescents.

17.     Upon information and belief, Defendant JUUL designed JUUL products to deliver almost no throat irritation while delivering increased doses of nicotine. In addition, Defendant JUUL packaged its JUUL products in easily concealable small devices that were branded to appeal to tech-savvy youth, and hired young models to tout the device on social media. The combination of JUUL's chemically manipulated nicotine and device results in a product that provides higher doses of nicotine than cigarette products.

18.     Upon information and belief, when Defendant JUUL launched the JUUL e-cigarette product, it said nothing about any of the problems that may occur from use of the

products, particularly by youth and nonsmokers, including long-term nicotine addiction; increased risk of heart disease and stroke; changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions; decreased functionality of the endocrine system; heightened risk of cancer; and negative effects on fertility. As one of the San Francisco engineers who invented the JUUL e-cigarette stated: "We don't think a lot about addiction here because we're not trying to design a cessation product at all; anything about health is not on our mind."[2] Released in 2015, JUUL products are now pervasive in the nation's schools and adolescent use is rampant. Defendant JUUL dominates the e-cigarette market and has expanded the size of that market significantly including adolescent non-smokers.

**The Government Takes Action to Address the E-Cigarette Epidemic**

19.     Upon information and belief, in 2018, after the FDA opened an investigation into youth based JUUL product use, Defendant JUUL removed website depictions of young models and replaced the same with middle-age adults suggesting that JUUL products exist as a traditional smoking alternative.

20.     Defendant JUUL markets its product as a smoking cessation device and/or smoking alternative (through switch campaigns), it has not received FDA approval as modified risk tobacco product or as a nicotine replacement therapy, and upon information and belief, Defendant JUUL has not participated in any FDA approval process.

21.     Even after the FDA investigation into youth e-cigarette consumption, Defendants continue to sell JUUL products in flavors and continue to hide the truth concerning the nicotine content and the addictiveness of its devices.

---

2  https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul .

22.     On February 24, 2018, the FDA sent a letter to JUUL expressing concern about the popularity of JUUL products among youth. The FDA ordered JUUL to submit documents regarding its marketing practices. The FDA publicized this letter on its website.

23.     On September 12, 2018, the FDA continued to announce publicly the agency's concern for youth e-cigarette use and requested that the manufacturers " come back to the FDA in 60 days with robust plans on how they'll convincingly address the widespread use of their products by minors."

24.     Publicly, and in response to the FDA's alarm concerning the rise in youth e-cigarette use, Altria's CEO, Howard Willard, stated, in a letter to FDA of October 25, 2018, that the company "is alarmed about the reported rise in youth e-vapor use to epidemic levels."

25.     On September 24, 2019 CDC Principal Deputy Director Dr. Anne Schuchat told the House Oversight and Reform Committee' s panel on consumer products " Juul products use nicotine salts, which can lead to much more available nicotine," . She said doctors believe the salts allow nicotine to " cross the blood brain barrier and lead to potentially more effect on the developing brain in adolescents."

**Altria Defendants Relationship with Defendant JUUL and JUUL products**

26.     Altria's public stance on e-cigarettes markedly differed from its private undertakings with respect to JUUL.

27.     According to Altria' s Securities and Exchange Commission filings, on December 20, 2018, Altria Group, Inc. (" Altria" ) entered into a Stock Purchase Agreement (the " Purchase Agreement" ) with JUUL Labs, Inc. (" JUUL" ), pursuant to which Altria, through its wholly owned subsidiary, Altria Enterprises LLC (" Altria Sub" ), purchased for an aggregate

price of $12.8 billion, shares of JUUL's non-voting Class C-1 Common Stock, which will convert automatically to shares of voting Class C Common Stock upon antitrust clearance (collectively, the "Acquired Shares"), and a security convertible (the "True-Up Security") into additional shares of Class C-1 Common Stock or Class C Common Stock, as applicable, for no additional payment upon settlement or exercise of certain JUUL convertible securities (the "Transaction"). Closing of the Transaction (the "Closing") occurred simultaneously with the parties' entry into the Purchase Agreement and related transaction documents. As a result of the Transaction, Altria beneficially owns 35% of the issued and outstanding capital stock of JUUL, or approximately 33.2% on a fully diluted basis.

28.     In connection with the Transaction, Altria and JUUL have also entered into a services agreement pursuant to which Altria has agreed to provide JUUL with certain commercial services on a cost plus 3% basis for an initial term of six years.  Among other things, Altria will provide services to JUUL with respect to logistics and distribution, access to retail shelf space, youth vaping prevention, cigarette pack inserts and onserts, regulatory matters and government affairs. Altria has also agreed to grant JUUL a non-exclusive, royalty-free perpetual, irrevocable, sublicensable license to Altria's non-trademark licensable intellectual property rights in the e-vapor field, subject to the terms and conditions set forth in an intellectual property license agreement between the parties.

29.     Further, upon information and belief, Altria Defendants - through services agreement(s) - will: allow JUUL products to appear alongside Philip Morris combustible cigarettes; provide JUUL sales and distribution services; and send Defendant JUUL advertising and marketing messages to its customers.

30.    Also in connection with the Transaction, Altria, Altria Sub, JUUL and certain other stockholders of JUUL have entered into a voting agreement, an investors' rights agreement and a right of first refusal and co-sale agreement.

31.    The voting agreement, among other things, entitles Altria to immediately designate one board observer to the JUUL board of directors and, once antitrust clearance has been obtained, to designate one-third of the members of the JUUL board of directors.

32.    Upon information and belief, pursuant to the voting agreement, Altria designated Kevin C. Crosthwaite, Jr. Senior Vice President, Chief Strategy and Growth Officer of Altria to serve as Altria's board observer to the JUUL board of directors.

33.    On September 25, 2019 Altria announced that Kevin C. Crosthwaite, Jr. Senior Vice President, Chief Strategy and Growth Officer of Altria had been appointed by JUUL as its new Chief Executive Officer. Mr. Crosthwaite stepped down from his position as Senior Vice President, Chief Strategy and Growth Officer of Altria in order to join JUUL.

**Using Big Tobacco Practices as a Guide, JUUL Labs, Inc. Developed the JUUL e-Cigarette to Recreate the "Luxury" of Tobacco**

34.    Defendant JUUL and prior PAX Labs, Inc. began as Ploom, Inc. in 2007. The company's founders, Adam Bowen ("Bowen") and James Monsees ("Monsees"), both product designers by education and experience, invented the Ploom, a cigarette-shaped device into which pre-filled pods of ground tobacco were inserted and vaporized at lower-than-combustion temperatures using an electrical heating element.

35.    In 2014, Bowen, Monsees and others applied for a patent for the JUUL device, a self-regulating vaporization device and cartridge, which used a nicotine solution derived from

tobacco. Bowen is Defendant JUUL's Chief Technology Officer and Monsees is JUUL's Chief Product Officer.

36.    Defendant JUUL has used the tobacco industry's prior practices as a playbook. Monsees has publicly admitted that JUUL began by looking at tobacco industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the tobacco industry, governmental officials, and injured smokers. "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

37.    JUUL's research included documents about how tobacco companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature.  We are pretty fluent in 'Patentese' and we were able to deduce what had happened historically in the tobacco industry."    Among the documents JUUL would have had for research were those documenting how to manipulate nicotine pH to maximize the delivery of nicotine in a youth-friendly vapor that delivers minimal "throat hit"- a combination that creates unprecedented risks of nicotine abuse and addiction, as detailed further below.

38.    JUUL also used tobacco industry advertisements - which were created to lure non- smoking youth--as a guide to JUUL's own advertising campaigns.

39.    Defendant's JUUL e-cigarette is about the size and shape of a pack of chewing gum. The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Each

JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

40.    The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, Defendants can finely tune the amount of nicotine vapor the JUUL delivers.

41.    The JUUL e-cigarette's defective design poses unprecedented risks of abuse and addiction.   The JUUL device does not have a manual or automatic "off" switch.   On information and belief, neither the JUULpod nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the upper bound of a cigarette.   Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL product allows non-stop nicotine consumption, which is limited only by the device's battery.   As a result, the JUUL is able to facilitate consumption of levels of nicotine that a cigarette cannot match.   This makes it easier for the user to become addicted to nicotine.

42.    JUUL manufactures and distributes its nicotine formulation as JUULpods, which contain JUUL's nicotine liquid.   JUUL sells its pods in four-packs, in a variety of flavors.

43.     As set forth below, despite its founder's clear intent to create a "luxury" consumer product for people who do not smoke that is as addictive as cigarettes, JUUL has consistently marketed itself as an "alternative" to cigarettes, causing people to choose JUUL on the belief that it is less addictive and less dangerous than cigarettes.    Defendants have failed to disclose that: (1) contrary to JUUL's representations, there is a higher concentration of nicotine per pod than a pack of cigarettes; (2) even if the nicotine concentration were comparable, the unique way in which a JUUL vaporizer dispenses nicotine renders it more harmful and more addictive than cigarettes, which is problematic for everyone, but particularly for minors; and (3) for non-smokers who take up JUUL use, a significant likelihood exists of later migrating to cigarette smoking.[3]

**Like Cigarettes, the JUUL's Purpose is to Foster and Maintain Nicotine Addiction**

44.     All leading health authorities support the three major conclusions of a 1988 report by the Surgeon General of the United States regarding nicotine and tobacco:

a.     Cigarettes and other forms of tobacco are addictive;

b.     Nicotine is the drug in tobacco that causes addiction; and

c.     The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

45.     Nicotine fosters addiction through the brain's "reward" pathway. A stimulant and a relaxant, nicotine affects the central nervous system; increases in blood pressure, pulse, and

---

3 *See, e.g.*, Office of the United States Surgeon General, Surgeon General's Advisory on E-Cigarette Use Among Youth, 2 (December 18, 2018), available at  https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

metabolic rate; constricts blood vessels of the heart and skin, and causes muscle relaxation. When nicotine is inhaled, it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs. Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. These effects are caused by the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.

46. The neurological changes caused by nicotine create addiction. Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user.

47. Once a brain is addicted to nicotine, the absence of nicotine causes compulsive drug-seeking behavior, which, if not satisfied, results in withdrawal symptoms including anxiety, tension, depression, irritability, difficulty in concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations and tremors - and intense cravings for nicotine. Though smokers commonly report pleasure and reduced anger, tension, depression and stress after smoking a cigarette, many of these effects are actually due to the relief of unpleasant withdrawal symptoms that occur when a person stops smoking and deprives the brain and body of nicotine. Studies have found that most smokers do not like smoking most of the time but do so to avoid withdrawal symptoms.

13

48.    Although framed as a safe alternative to smoking, Defendants' JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users.  Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems. [4]   Nicotine adversely affects the heart, eyes, reproductive system, lung, and kidneys.

49.    Nicotine affects neurological development in adolescents, and exposure to nicotine during adolescence produces an increased vulnerability to nicotine addiction.[5]

### JUUL Manipulates Its Nicotine Formulation to Make It Attractive to Youth and Non- Smokers and More Potent and Addictive than Cigarettes

50.    Tobacco companies spent decades manipulating nicotine in order to foster and maintain addiction in their customers including youth. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke.

51.    Defendant JUUL knowingly used prior tobacco industry research and conclusions to produce a similar nicotine kick; and thereby promoting increased use and sales of JUUL e- cigarettes. In U.S patent No. 9,215,895 assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier.

52.    JUUL's manipulation of nicotine pH directly affects the palatability of nicotine

---

4  See Mishra, A., et al., HARMFUL EFFECTS OF NICOTINE, Indian J. Med. Paediatr. Oncol., 36(1): 24-31 (Jan.-Mar. 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/.
5  Arain, M., et al., MATURATION OF THE ADOLESCENT BRAIN, Neuropsychiatric Disease and Treatment, 9, 449-461 (Apr. 25, 2013), http://doi.org/10.2147/NDT.S39776.

inhalation by reducing the "throat hit" users experience when vaping.   Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form.   This reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat.   At least one study has confirmed the low ratio of freebase nicotine in JUUL products. *See* Duell, James F. Pankow, and David H. Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1 H N MR Spectroscopy*, 31 Chem. Res. Toxicol. 431,431 (2018).   The Duell study indicates that the vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine-and hence causes the same amount of irritation - as a non-salt e-liquid with one-twentieth the amount of nicotine as a JUUL (3mg/mL compared to the JUUL's 59 mg/mL). *Id.*   The Duell study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." *Id.*, 431-434.

### JUUL Has Deceptively Marketed Its JUUL E-Cigarette as an Alternative to Cigarettes, When It is More Potent and More Addictive Than Cigarettes

53.   Defendant JUUL's creation of a product with low levels of harshness and minimal " throat hit" is consistent with the goal of producing a product for non-smokers.   The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation.   The design also shows that JUUL's intention was to recruit nonsmokers, not existing smokers, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix.   Minimizing the " throat hit" of JUUL e- cigarettes is therefore unnecessary to providing an

alternative for adult smokers, but is crucial to luring a new generation of users.

54.      Defendant JUUL's product lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine.   The "throat hit" is part of the body's alert system, letting a person know they are inhaling something harmful. Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation.   Reducing or removing this feedback impairs the user's ability to ascertain that they are consuming a toxin.   As a result, the craving for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction.

55.      Defendants sell products that contain relatively low amounts of throat-irritating freebase nicotine, yet contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems ("ENDS") containing freebase nicotine.

56.      Blood plasma studies in Defendant JUUL's patent show that vaping nicotine benzoate increases nicotine delivery compared to cigarettes or vaporized solutions of freebase nicotine.   Defendants JUUL products are delivering doses of nicotine that are higher than delivered by combustible cigarettes.

57.      Despite the above, Defendants have failed to disclose to consumers that JUUL products deliver an exceptionally potent dose of nicotine.

58.      In sum, Defendants have either misrepresented the pharmacokinetic effect of its products or altered the composition and, hence, pharmacokinetic effects of its products without disclosing that material fact to consumers.

59.      Because JUUL's nicotine salts actually increase the rate and magnitude of blood

plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes.   Thus, far from helping smokers quit, the JUUL products simply increase their level of addiction to nicotine.   Further, JUUL products are foreseeably exceptionally addictive when used by persons without prior exposure to nicotine—a fact not disclosed by Defendants.

60.    At the same time, as discussed above, the throat "hit" from nicotine salts is much lower than that for combustible tobacco products, making it easier to inhale.   According to researchers, the "high total nicotine level (addictive delivery)" of a JUUL coupled with its easily inhalable nicotine vapor is "likely to be particularly problematic for public health." Anna K. Duell et al., Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy, 431 (2018).

61.    Defendants have fraudulently concealed material information about the addictive nature of its e-cigarettes. Defendants necessarily are in possession of all of this information.   Plaintiffs' claims arise out of Defendants' fraudulent concealment of material facts concerning the JUUL e-cigarette and Defendants' representations about the JUUL e-cigarettes' nicotine content, potency, benzoic acid content, and physiological effects of JUUL e-cigarettes.    To the extent that Plaintiffs' claims arise from Defendants' fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims.

62.    Plaintiffs allege that at all relevant times, including specifically at the time they purchased or used JUUL e-cigarettes, Defendants knew that JUUL e-cigarettes were not safe under any circumstances for non-smokers, and posed a risk of aggravating nicotine addiction in

those already addicted to cigarettes.    Defendants also knew that JUUL's nicotine solution could deliver more nicotine into the bloodstream than a cigarette, and did so more quickly than a cigarette.    Defendants were under a duty to disclose this material information based upon their exclusive knowledge of it, and their concealment of it; and Defendants never disclosed the defect to Plaintiff or the public at any time or place or in any manner.

### JUUL Falsely Represents that Each JUULpod Contains the Nicotine Equivalent of a Pack of Cigarettes, when They Actually Deliver a Particularly Potent Dose of Nicotine

63.    Defendant JUUL repeatedly represented that a single JUULpod contains an amount of nicotine equivalent to about a pack of cigarettes. For example, some JUUL advertisements and JUUL's website currently provides that each JUULpod is designed to contain approximately 0.7ml with 5% nicotine by weight at time of manufacture which is approximately equivalent to pack of cigarettes or 200 puffs.    This falsehood is recast in JUUL advertisements, and on JUUL's website, into the claim that a JUUL delivers about as much nicotine as a cigarette.

64.    This statement is false and seriously misleading because, as Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use.

65.    Further, while a pack of cigarettes contains 20 cigarettes which each have to be separately lit, the JUUL can be inhaled continuously, and often can be used indoors without detection by others, a feature that Defendant JUUL promoted heavily in its advertisements, eliminating the need for smoking breaks.    Thus, the device design leads users to intake far more

18

nicotine than would occur with cigarettes.

66.     As Defendants JUUL products deliver more nicotine than a pack of cigarettes (both per pack and per puff), Defendants' JUUL's products have the foreseeable effect of luring youth, who like a strong nicotine "kick," and exacerbating nicotine addiction and other adverse health effects associated with nicotine consumption when compared to cigarettes.

**Defendants Intend to Continue to Deceive Consumers as to Nicotine Content**

67.     From JUUL's pre-release announcements to this day, JUUL has continuously represented in advertisements, press releases and website, that each pod contains as much nicotine as a pack of cigarettes.

68.     Upon information and belief, despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018.   The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUULpods away from children and pets, but contained no warnings specifically about the known effects, or unknown long-term effects, of nicotine or vaping/inhaling nicotine salts.   Many of JUUL's advertisements, particularly prior to November 2017, also lacked a nicotine warning.

69.     Furthermore, Defendant JUUL misrepresents the nicotine content of JUULpods by representing it as 5% strength when the JUUL products contain more by volume.   Defendant JUUL's "5% strength" statement misrepresents the most material feature of its product-the nicotine content-and has misled consumers to their detriment.

70.     If JUUL did not know when it released JUULpods in 2015 that its "5% strength" representation was misleading, it quickly learned that there was widespread confusion about the

pods' nicotine content.   JUUL did nothing to stop or correct this confusion about the nicotine content of its JUULpods.

71.    JUUL's "5% strength" statement is also misleading because JUULpods routinely contain more than even the 59mg/mL JUUL claims on its website.   At least two independent studies testing multiple varieties of JUULpods have found significantly higher concentrations of nicotine than JUUL's label represents.

### JUUL's "Switch" campaign suggests that JUUL is a smoking cessation device and that JUUL use is a cost-effective alternative to smoking

72.    The JUUL has not been approved as a smoking cessation therapy nor has it been approved as a modified risk tobacco product.

73.    Through the Switch campaign, JUUL urges smokers to switch to JUUL. Though the Switch advertisements do not say as much, the tacit message of the Switch campaign is "switch because, unlike cigarettes, JUUL is harmless to your health."

74.    The Switch campaign suggests that smoking and JUULing are mutually exclusive and that purchasing a JUUL will "switch" a smoker to a non-smoker.

75.    Defendants know that a large number of smokers who use JUUL products do not end up switching but end up smoking *and* JUULing.

76.    JUUL has advertised cost-savings calculators as part of its switch campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine as he or she did as a smoker (i.e., a pack a day smoker is presumed to consumer one JUULpod a day). JUUL knows that its calculator is misleading because smokers who switch to JUUL typically increase their nicotine intake or continue consuming cigarettes

and JUUL products, rendering JUUL's calculator misleading at best.

77.     The Switch campaign does not disclose or warn about the risks of multiple tobacco product use or that the JUUL is not a smoking cessation product.

### Defendants Falsely Market, Advertise and Sell E-Cigarette "Autoship" Services as "Cancel Anytime" Service, Without Disclosing the Products' Highly Addictive Nature

78.     Defendants intentionally misrepresent and omit information about the highly addictive nature of nicotine from the JUUL purchase process (and advertisements) because they know that consumers will have an impaired ability to cease using JUUL e-cigarettes and JUULpods once they are addicted, making their ability to "cancel anytime" illusory. Defendants never disclose to consumers that JUUL e-cigarettes and JUULpods are at least as addictive if not more addictive than traditional cigarettes.   Instead, Defendants market the JUUL products as an "alternative to cigarettes," thereby giving the false impression that they are less addictive than traditional cigarettes and safe to use.

79.     JUUL also offers "Autoship" as a service that provide "pods at your door and savings in your pocket. 15% off every order. Cancel anytime."

80.     The "Cancel anytime" representation is materially misleading. While it is true that consumers are not obligated to purchase additional JUULpods, there is no disclosure of the fact that use of the JUUL e-cigarettes and JUULpods is likely to result in nicotine addition, thereby interfering with the user's ability to "cancel anytime."   Defendants, in fact, know (and prey upon the fact) that once a consumer begins using JUUL products, they will become addicted to those products and continue to purchase them, often in increasing amounts in order to achieve the same "high" as their tolerance to nicotine increase.

81.     The highly addictive nature of the JUUL products also means that the consumers of the JUUL products, including Plaintiffs and Class Members, will continues to suffer economic injury far into the future, as they will have to keep buying additional JUUL products if they want to avoid the physically and mentally difficult effects of nicotine withdrawal. Defendants intend its products to "hook" its consumers, including children, into becoming long-term or life-long customers, which inures to Defendants' benefit.

82.     Although Defendants contend that they need not disclose these facts because the products are only designed for existing cigarette smokers, and that its products are purportedly safer than regular cigarettes, the contention is belied by Defendants' own knowledge, marketing plan and intentions, which is to grow a new group of consumers of nicotine products, not just to market to the shrinking number of existing cigarette smokers.

### JUUL Deployed a Viral Marketing Campaign That Continued the Tobacco Industry's Long-Standing Campaign of Deceptive Advertising and Unfair Business Practices

83.     As described further below, Defendants have used the same strategies perfected by big tobacco to sell Defendants' JUUL products to minors and young adults, to great success. In particular, JUUL has both exploited regulatory loopholes and relied heavily on social media and other viral advertising tools to hook people, and in particular minors, on its addictive e-cigarettes.

84.     To accomplish this, JUUL adopted the same themes used by Philip Morris and other Big Tobacco companies in the cigarette industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and deleterious health effects.

### Overview of Viral Marketing Campaigns and Online Marketing

85.     "Viral marketing" is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."   Viral marketing is a form of word-of-mouth recommendation that harnesses the network effect of the internet to rapidly reach a large number of people.   Because the goal in a viral marketing campaign is to turn customers into salespeople who repeat a company's representations on its behalf, a successful viral marketing campaign may look like millions of disconnected, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaign.

86.     Companies may use different media to transmit their viral messaging, but generally, all viral marketing campaigns tend to share similar features, including (1) a simple message—typically implied by an image-that elicits an emotional response; (2) the strategic use of marketing platforms, especially social media, to reach and engage the target audience; (3) use of content that invites participation and engagement; and (4) use of third parties to magnify the impact of a message.

87.     Typically, a viral marketing campaign will begin with a "push" by the company seeking to advertise the product, and since the advent of social media, that push is typically done through the creation of new content on a social media platform, such as Instagram, YouTube, Twitter, Facebook or other similar platform ("Social Medial Platforms").   A company that wants to push an ad on Social Media Platforms has a few options available to it.   First, the company can solicit followers to its social media pages, so that when the company posts to its feed, the content would be delivered to those followers and to those who visited the company

23

page.   Second, the company can purchase paid advertisements that were delivered to specified target audiences. Then, to amplify a message, companies can utilize other tools, such as paid influencers and strategic use of promotions and hashtags, to blanket the targeted demographic with advertisements across social media.

88.     Companies seeking to advertise new products or reach a new demographic have discovered the power of the "like" and "share" features on social media, which allow users to promote content to their own audiences.

89.     With the advent of social media, viral marketing campaigns have become a particularly effective way to reach young people, particularly teenagers.

90.     Companies can also take viral messaging off-line. By running simple, catchy ads with minimal text and graphic visuals, and displaying those ads in various forms, companies generate buzz and discussion, which is reinforced through social media.

### The Tobacco Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors to Hook New Underage Users on Its Products

91.     To remain profitable, the tobacco industry must continue to woo new customers: some existing customers wean themselves from addiction and the others eventually die, so replacement customers are needed.   In recent years, tobacco usage in the United States has fallen dramatically, with particularly large decreases in the youth smoking rates, which tobacco companies have been vigorously trying to counteract.   The tobacco industry knows that the younger a person starts smoking, the longer they will have a customer.   The importance of the youth market was illustrated in a 1974 presentation by RJR s Vice-President of Marketing who explained that the "young adult market . . . represent[s] tomorrow' s cigarette business.  As this

24

14- 24 age group matures, they will account for a key share of the total cigarette volume - for at least the next 25 years."[6]

92.     Though no single-source causative factor can describe the complex link between marketing and youth smoking, the overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation." *USA v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006).   Because teenagers are at a stage in their psychosocial development when they are struggling to define their own identities, they are particularly vulnerable to image-heavy advertisements providing cues for the "right" way to look and behave amongst peers. *Id.* at 578. Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation. *Id.*, 570 and 590.   By making smoking a signifier of a passage into adulthood, tobacco companies turned smoking into a way for teenagers to enhance their image in the eyes of their peers. *Id*. at 1072.

93.     The landmark *USA v. Philip Morris* case revealed that tobacco companies targeted adolescents for decades by: "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion strategies to knowingly reach teenagers."   No. 99-cv-2396, ECF 5732, ¶ 2682 (D.D.C. 2008).   In terms of images and themes that cater to adolescents, the court found "overwhelming" evidence that tobacco companies intentionally exploited adolescents' vulnerability to imagery by creating advertising emphasizing themes of "independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual

---

6 https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id-ypmw0091 .

attractiveness, thinness, popularity, rebelliousness, and being 'cool.'" *Id*, ¶ 2674.

94.    Thus, the industry has long used viral marketing campaigns to push its products on children, teens, and young adults.  Prior to the advent of the Internet, tobacco companies engaged in "viral advertising" or "influential seeding" by paying "cool people" to smoke in select bars and clubs, with the "idea being that people will copy this fashion, which would then spread as if by infection." *Golden Holocaust*, 119 (citing Ted Bates and Co., *Copy of a Study of Cigarette Advertising Made by J.W. Burgard; 1953*, (Lorillard), n.d., Bates 04238374-8433. By simply paying some attractive, stylish third parties to use the product in trendy public places, tobacco companies were able to create buzz and intrigue.  As word spread, the public would develop a strong association in people's minds that smoking was what young, cool adults were doing.

95.    Today, cigarette manufacturers like Defendants are limited in their ability to advertise in the United States, but actively use viral marketing techniques outside of the United States.  For example, Japan Tobacco International, one of JUUL's early investors, launched social media campaigns including a "Freedom Music Festival" promoting Winston cigarettes in Kazakhstan, Kyrgyzstan, and Jordan.  Similarly, Phillip Morris International, a spin-off of Altria, JUUL's largest stakeholder, has used influencer campaigns in multiple countries.  A campaign in Indonesia called "I Decide To" has been viewed more than 47 million times online. A hashtag marketing campaign called #NightHunters in Uruguay used paid influencers to pose with menthol cigarettes and was seen by nearly ten percent of Uruguay's population.

96.    Similarly, in 1988 the R.J. Reynolds Tobacco Company introduced the infamous Joe Camel cartoon campaign, which faced instant criticism due to how appealing the cartoon

animal was to children and teens.   Joe Camel was drawn as sleek, metropolitan figure, typically wearing sunglasses or a tuxedo, or was depicted driving convertibles, gambling, or playing pool. The ads often used the phrase "Smooth Character," which to teenagers, meant he had a slick, cool personality.   That in turn led to an association between smoking and coolness in the minds of young people.   To ensure that message stuck, R.J. Reynolds put up billboards featuring Joe Camel near schools, and printed Joe Camel shirts, hats, and other paraphernalia, ensuring the campaign would be carried far and wide, and that kids would constantly be exposed to it.   Only three years after the campaign began, in 1991, the Journal of the American Medical Association published a study showing that by age six nearly as many children could correctly respond that "Joe Camel" was associated with cigarettes as could respond that the Disney Channel logo was associated with Mickey Mouse, and it alleged that the "Joe Camel" campaign was targeting children, despite R. J. Reynolds claim (similar to the claim of Defendants here) that the campaign was directed only to adults who were already smokers of other brands. Paul M. Fischer, MD, et al, Brand Logo Recognition by Children Aged 3 to 6 Years, Journal of the American Medical Association, Dec. 11, 1991.   At that time researchers estimated that 32.8% of all cigarettes sold illegally to underage buyers were Camels. DiFranza JR, et al., RJR Nabisco s cartoon camel promotes camel cigarettes to children. Journal of the American Medical Association, Dec. 11, 1991. (The JUULs represent an even higher percentage of all cigarettes and e-cigarettes sold to minors.)   The Joe Camel campaign ended under the pressure of an impending civil trial brought by the City Attorney in San Francisco, Congressional investigation, and public pressure. *See* https://en.wikipedia.org/wiki/Joe_Camel#cite_note-8.

97.     Tobacco companies have also known for decades that flavored products are key

to nicotine adoption by youth. A 1972 Brown & Williamson internal memorandum titled "Youth Cigarette - New Concepts," observed that "it's a well-known fact that teenagers like sweet products."   A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.   A 2004 study found that 17-year-old smokers were more than three times as likely as those over the age of 25 to smoke flavored cigarettes*, and they viewed flavored cigarettes as safer.*   Tobacco companies also used advertisements that paired cigarettes with foods, to make it seem like cigarettes were part of a healthy meal.

### Because of The Role of Advertising in Youth Smoking, Tobacco Companies are Prohibited from Viral Marketing Practices and Use of Flavors

98.     Most of the activities'   described in the section above are now recognized against public policy, and thus forbidden for tobacco companies.

99.     Under the Tobacco Master Settlement Agreement ("MSA"), reached in 1998, participating manufactures agreed not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incident of Youth smoking within any Settling State." MSA § III (a).   They are also prohibited from:

a.   using outdoor advertising such as billboards,

b.   sponsoring events,

c.   giving free samples,

28

    d.  paying any person "to use, display, make reference to or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media," which includes "any picture, television show, theatrical production or other live performances," and any "commercial film or video,"; and

    e.  paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing

100.    In 2009, the FDA banned flavored cigarettes pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. The FDA commissioner Dr. Margaret A. Hamburg announced the ban because "flavored cigarettes are a gateway for many children and young adults to become regular smokers."

101.    The Tobacco Control Act of 2009 also prohibited sales of cigarettes to minors, tobacco-brand sponsorship of sports and entertainment events or other social or cultural events, and free giveaways of sample cigarettes and brand-name non-tobacco promotional items.

**JUUL's Marketing Leveraged Banned Strategies Perfected by Tobacco Companies to Induce Minors and Young Non-Smokers to Purchase JUUL Products**

102.    Following the successful model of its predecessors, since 2015, Defendant JUUL has been operating a long-term viral marketing campaign aimed at teenagers and young adults. This campaign extends and expands upon deceptive advertising tropes used by tobacco companies to exploit the psychological needs of consumers-especially youth-to convert them into smokers.

103.    JUUL's admitted reliance on tobacco industry documents is apparent in a collection of 82 JUUL advertisements compared to historical cigarette advertisements on

Stanford's Research into Impact of Tobacco Advertising ("SRITA") website.   The side-by-side comparison of numerous JUUL advertisements shows that its imagery directly parallels that adopted by cigarette manufacturers.

104.    Because of social media, JUUL has been able to operate an even more pervasive, insidious, and successful viral marketing campaign than its predecessors in this industry.   As set forth below, JUUL developed and oversaw long-term viral marketing campaign with the intent to convince minors to purchase its products.   Defendant JUUL's advertisements presented images depicting and idealized future self that adolescents could achieve by taking up JUUL products.

105.    JUUL carried this campaign out by (i) intentionally designing a campaign that was simple and would trigger an emotional response, particularly with young people; (ii) intentionally designing flavored products that would appeal to teenagers and young adults; (iii) directing its advertising to teenagers and young adults on social media; (iv) utilizing third party influencers to amplify its message around the internet; (v) utilizing other social medial tools, such as hashtags, to encourage participation and word-of-mouth messaging by its customers; (vi) amplifying the message through off-line advertising; and (vii) using a pricing and distribution model designed to put the product within reach of youth.   JUUL's advertisements consistently withheld material information about the dangers of the product.   Through this long-term advertising campaign, JUUL product was cool, while hiding from them the dangers associated with using the product. And because of the viral nature of JUUL's marketing, JUUL promotions continue to reach youth, despite JUUL's deactivation of its social media accounts.

**JUUL Advertising Used Imagery that Exploited the Psychological Vulnerabilities of Youth**

106.    Throughout the class period, JUUL ran a consistent, simple message on social medial that communicated to people, and in a particular, teenagers and young adults that JUUL's products were used by popular, attractive, and stylish young adults (i.e., an idealized version of an adolescent's future self) while failing to adequately and conspicuously disclose the nature of risks of the product.

107.    In designing the campaign, Defendant JUUL knew that to increase the chances that content goes viral amongst the teen demographic, it needed to design a campaign that was simple, would generate emotional response that would resonate with teenagers, and obscured the fact that the product was unsafe and addictive.

**JUUL's Launch Campaign Was Targeted to
Create Buzz Among Young Consumers**

108.    To announce Defendant JUUL's product release in June 2015, JUUL launched the "Vaporized" advertising campaign that was aimed at a youth audience.   The campaign used young, stylish models, bold colors, and memorable imagery.   The models were often using hand gestures or poses that mimicked underage teenagers.

109.    The Vaporized campaign advertisements featured young, stylish models and images of attendees at JUUL's launch parties and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool."   In other words, the Vaporized campaign targeted youth using the exact template established by Big Tobacco decades earlier.

110.    Often the Vaporized ads contained the phrase "Smoking Evolved," so that consumers, and in particular youth, would associate JUUL with high tech and the latest

generation of cool products, like iPhones and MacBooks.

111.    The color Scheme chosen was similar or colors used by Natural Americans Spirit Cigarettes, a leading brand of cigarettes among teenagers.

112.    Nowhere in the Vaporized ads did JUUL include any visible or prominent disclaimers about the dangers of nicotine described above.

113.    As part of the Vaporized campaign, JUUL advertised on a 12-panel display over Time Square.   Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement reached between 46 states' attorney general and tobacco companies, but JUUL took advantage of the agreement's failure to foresee the rise of vaping products to advertise its nicotine products in a manner that had already been deemed against public policy for other nicotine products.

114.    To ensure that its message would spread, JUUL utilized several other tools to put its products in front of young people.   First, it ran the Vaporized campaign in the front spread of Vice magazine's cover issue.   Notably, Vice bills itself as the "#1 youth media brand" in the world and is known for running edgy content that appeal to youth.   JUUL has also implemented a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons, imitating pop-up restaurants and bars typically aimed at attracting young, hip urban consumers.   Again, this is an activity which would have been prohibited by law for a cigarette company on the ground that it was against public policy.

115.    JUUL's chief marketing officer, Richard Mumby said "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product."   This reliance on images of young, diverse users was specifically aimed at

convincing young people who were not previously cigarette smokers to purchase JUUL products, to make the use of JUUL appear fun and without long-term negative consequences, to position JUUL e-cigarette as the e-cigarette of choice or young adults, and to introduce youth to JUUL products.

### JUUL Gave Away Free Products to Get New Consumers Hooked

116.    JUUL distributed free starter packs at the live social events which is conduct forbidden for a tobacco company under the Tobacco Master Settlement Agreement.

117.    Though JUUL publicly acknowledged in October 2017 that it is unlawful to distribute free samples of its products at live events, JUUL continued to do so, sometimes through $1 "demo events."  Notably, promotions of this kind are prohibited for tobacco companies by the MSA.

118.    The effect-and purpose-of JUUL's Vaporized giveaways was to  flood  major cities with free product which by its addictive nature would hook tens or hundreds of thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JUUL's message to their friends via word of mouth and social media.  Similar campaigns have long been used by drug cartels.   This campaign unconscionably flooded cities with free samples of an addictive product, with distribution focusing on the youth market.   As a foreseeable result, JUUL products ended up in the hands of non-smokers and youth, who used the products and became addicted to nicotine.

### JUUL Portrayed Its Products as Status Symbols

119.    As tobacco companies have long known, young people - and adolescents in particular - find security and a sense of identity in status symbols.   Even after the "Vaporized"

campaign, JUUL's later advertisements mimicked the look and feel of the "Vaporized" ads to foster the image of JUUL e-cigarettes and JUULpods as sleek, stylish, status symbol.

120.    JUUL also consistently compared the JUUL to the iPhone through statements like "the iPhone of e-cigarettes," which JUUL posted on its website, distributed through social media, and disseminated through its email campaign.   The iPhone is the most popular smartphone among adolescents.   JUUL's advertising images frequently include pictures of iPhones and other Apple devices, including iPads, Beats Headphones, MacBook laptops. Through these images, JUUL presented its image a "must have" technology product and status symbol, instead of a nicotine delivery system.

121.    Beyond triggering an emotional response in teenagers, all of JUUL's social media advertising had three additional things in common.   First, through the use of clean lines, artistic arrangements, minimal text, and eye-catching graphics, JUUL ensured that the advertisements would jump out to distracted teenagers who scrolled crowded social media pages on their phones and browsers.

122.    Second, all of JUUL's advertisements reflect an understanding that social media users in general, and teenagers in particular, do not typically read long blocks of text on social media, and rely more heavily on imagery instead of text to convey a message.

123.    Moreover, where JUUL's advertisements appeared to contain such a disclaimer, this disclaimer was not typically seen when viewing social media due to the way the posts appear in phones and browsers.   In particular, Facebook and Instagram typically only present to users the image and a couple lines of text, and viewers who want to see the entire post must click on it to open it up and read the rest.

34

124.     Third, JUUL's advertisements were typically creative, giving them the look and feel of "art."   Thus, teenagers were drawn to the advertisements, holding their gaze on the ads for longer periods of time, and being more inclined to share the advertisement with others in their networks, thus accomplishing JUUL's goal: turning consumers into salespeople.

**JUUL Used Flavors and Food Imagery to Attract Non-Smoking Teenagers and Adults**

125.     JUUL sells its JUULpods in a variety of sweetened flavors.    It even advertised some of its flavors as though they were desserts in themselves.

126.     The tobacco industry has long known that sweetened cigarettes attracted young smokers and the FDA banned flavored cigarettes for that reason.

127.     The use of flavors that appeal to youth has a marked effect on e-cigarette adoption by underage "vapers."   A national survey found that that 81 percent of youth aged 12-17 who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month.   Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like." *See* Ambrose, BK, et al., "Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014," Journal of the American Medical Association, published online October 26, 2015.

128.     Research also shows that when youth see flavored ENDS liquids advertisements, they believe the advertisements and products are intended for them. *See, e.*g., McKelvey K et al., Youth say ads for flavored e-liquids are for them, Addict Behav. 2018 Aug 29. pii: S0306-4603(18)30957-2. doi: 10.1016/j.addbeh.2018.08.029.

129.     The use of attractive flavors foreseeably increases the risk of nicotine addiction,

as traditional cigarette product designs aimed at reducing the unpleasant characteristics of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to contribute to the risk of addiction.

130.    In 2017, JUUL released what are now the two most popular flavors among youth: Mango and "Cool" Mint ("Cool Mint"). JUUL then promoted those flavors on Instagram, Twitter, YouTube and Facebook-all of which are skewed toward young audiences.

131.    JUUL's Mango pods quickly became the runaway favorite among youth.

132.    "Cool" Mint became youths' second youth favorite flavor. In addition to its nicotine content, the "Cool" Mint pods pose additional risks.   The FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had drug-like effects, including "cooling and anesthetic effects that reduce the harshness of cigarette smoke."

133.    JUUL's advertising emphasized the flavors of its sweetened nicotine pods. Leveraging the flavors, JUUL advertised JUUL pods as part of a meal, to be paired with other foods. In fact, Defendant JUUL even hired celebrity chefs to provide pairing suggestions for JUUL flavors.

134.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture. JUUL's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.

135.    JUUL's use of flavors unfairly targeted not only youth, but unsuspecting adults as well.   By positioning JUULpods as a delicious treat rather than a system for delivering a

highly addictive drug, JUUL unfairly led consumers to the conclusion that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

136.    By modeling its nicotine pods' flavor profiles on sweets, naming its nicotine pods after those sweets, and using images of the sweets in JUULpod advertisements, JUUL conditioned viewers of its advertisements to associate JUUL with those foods.     Through this conditioning process, Defendants sought to link the sight or mention of JUUL products to mental images of the fruits and desserts in JUUL's advertising, which would in turn trigger food-based physiological arousal including increased salivation and heart rate.    These physiological responses, in turn, would make JUUL use appealing for reasons relating to flavor - and not switching from smoking - while simultaneously clouding viewers' ability to assess the risks of JUUL's flavored pods.

137.    At least as early as 2017, JUUL knew without any question that the foreseeable risks posed by fruit and candy-flavored e-liquids had materialized.   A significant fraction of JUUL's customers included adolescents who overwhelmingly preferred Fruit Medley and Creme Brulee over Tobacco or Menthol. *See* Truth Initiative, *JUUL fails to remove all of youth's favorite flavors form stores* (Nov. 15, 2018), available at: https://truthinitiative.org/new/juul-fails-remove-all-youths-favorit-flavors-stores.   Instead of taking corrective action or withdrawing the sweet flavors, JUUL capitalized on youth enthusiasm for its products.

138.    While JUUL maintains that it has strict age verification procedures on its website and limits purchases to users who are 21 and older, *it continues to permit consumers to purchase*

*up to 60 flavored JUULpods every month*, which is, at a minimum, the equivalent of sixty packages of cigarettes, and likely much more.   JUUL knows that its JUULpods are likely to make their ways into the hands of teenagers, either through entrepreneurial young people purchasing the JUULpods and in excess and re-selling them, or from the JUULpods making their way into the United States from Canada.

139.    The only solution to prevent flavored JUULpods from getting into the hands of children is to stop manufacturing them.

### JUUL Developed Point-of-Sale Advertising That Emphasized the Products' Positive Image Without Adequately Disclosing Its Nature and Risks

140.    The tobacco industry spends $8.6 billion a year in point-of-sale ("POS") promotions-or almost $990,000 every hour.   Younger smokers, in particular, are more likely to make unplanned tobacco purchases in the presence of POS advertising.

141.    Before its launch in 2015, JUUL and Cult Collective developed innovative packaging and creative in-store displays that would carry their message through into stores.   In particular, they designated bright, white packages.   The packaging looked similar to iPhone packaging, which JUUL knew would resonate with young people, and because it was solid white, the packaging stood out and caught people's eyes when displayed in store shelves. This packaging buttresses Defendant's online marketing of JUUL e-cigarette as "the i-Phone of E-cigs," thereby framing them as a cool, fashionable item to own and use. JUUL posters and signs at the point of sale also promoted JUUL's flavors.

142.    From 2015 through late 2018, JUUL promoted JUUL products and JUUL flavors at the point of sale without disclosing that the products contained nicotine or warning that the

products could lead to addiction.   Instead, JUUL's promotions displayed the colorful JUULpod caps and their food-based names while omitting the most material feature of the JUUL – that it delivers nicotine.

143.    For many, JUUL's POS material provided an introduction to the brand. Because JUUL's POS materials omitted the most material features of JUUL's product – that it is an addictive nicotine delivery system – adolescents who saw JUUL's POS and were later offered a JUUL would have no reason to think that what they were being offered JUUL contained nicotine or posed risks of addiction.

### JUUL Used Social Media to Inundate Target Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products

144.    JUUL not only designed its advertising with an eye to what might be appealing to young people but set about disseminating those ads to ensure that young people see them. JUUL set out to advertise on at least three major Social Media Platforms: Instagram, Facebook, and Twitter, and disseminated the information in various ways across the platforms.

145.    On information and belief, JUUL maintains active accounts on most social media platforms, including Instagram, Facebook, and Twitter, where JUUL tweeted nearly 5,000 times in 2017 alone.   As of 2016, 76 percent of American teens age 13-17 used Instagram, 66 percent of teens use Facebook, and 44 percent of teens use Twitter.

146.    With respect to Unpaid Advertising, Instagram was the centerpiece of JUUL's teen- focused advertising blitz. Instagram is used overwhelmingly by teenagers.   While increasingly more adults are using Instagram, this has been a recent development, and as such, advertisers typically only use Instagram if they are interested in marketing to young people,

especially teenagers.

147.    Because of the way Instagram delivers content, Instagram allowed for fast, effective delivery and sharing of its graphic, simple messages.   Users would see these images simply by scrolling through their feeds.

148.    JUUL also disseminated Unpaid Advertising across social media through its use of hashtags. Hashtags are simple phrases preceded by a #, and they operate as a way of cataloguing posts.   Authors of posts use hashtags if they want their posts to be discovered and seen by people outside of their networks.   On most social media platforms, users can find information by doing a search for a hashtag with that key word.    Thus, people interested in JUUL, could enter into the search bar on most Social Media Platforms "#JUUL" to find posts that include that hashtag. Instagram takes it one step farther and allows users to set up their accounts so that posts with a certain hashtag are automatically delivered to their feed.

149.    JUUL's hashtag marketing played a central role in the viral spread of JUUL between teenagers.

150.    From 2015 through 2018, JUUL used hashtag marketing consistently on Twitter, Instagram, and Facebook to promote its products.   In various posts, JUUL would slip in hashtags so that their posts would be found by young people.

151.    In disseminating Paid Advertising, the Social Media Platforms allow companies like JUUL to engage in micro-targeting, i.e., to select precisely what demographics of people should be exposed to its advertising.   Social Media Platforms create internal profiles for the consumers that use them, tracking their online activity to determine their likes, habits, and purchasing power.   When advertisers pay to disseminate ads, they can choose to target those

ads so that they are received only by people whose digital footprint suggests an interest or predisposition to the product.    JUUL would have had the option to exclude teenagers.  It also could have elected to narrow its target audience to people with an interest in tobacco products, if it wanted to reach and convert non-smokers.   Or it could target a broader audience of people whose digital footprints did not reveal that they were smokers.

### JUUL Paid Third Party Influencers and Affiliates to Amplify Its Message to a Teenage Audience

152.    To broaden the reach of its campaign, JUUL used "influencers" to push the product to young people.   Influencers are "high-social net worth" individuals who have developed large social media followings - i.e., the "cool kids" of the social media world.  People follow influencers because they tend to deliver lots of high quality, interesting photos and content, and because they are known to be trend-setters.

153.    Viewed as tastemakers and trendsetters by their followers, influencers are prized sources of brand promotion on social media networks.   Companies seeking to market products often will pay influencers to advertise their products, similar to the ways in which they utilize "product placement" in movies.   They seek out influencers with large amounts of followers in their target demographic, and will offer these influencers money or other deals to promote their products.   The influencer then will create various posts on social media using the product.  Typically, these posts are images of them using the product, but sometimes these posts will include videos, longer written reviews, or other information about the product.   Influencers often include in these posts company-endorsed hashtags or links to the company's website to try to direct their followers to learn more.   The company gets the benefit of having word-of-mouth

advertising, and the influencer is able to attract more followers because those followers want to stay in the loop about new products and deals.   While influencers operate on all Social Media Platforms, most of them rely primarily on Instagram. Defendant JUUL relied on a variety of influencers to carry out its viral marketing campaign and even listed positions at its company for Internships for the same.

154.    JUUL's outreach had its desired impact, as it was able to line up influencers and celebrities to promote its products to teenagers, while spreading pictures of cool, young people using JUUL.   Collectively, the influencers JUUL promoting videos, posts and other social media have generated millions of views, and the viral content their posts have spawned have almost certainly generated many millions of additional views.

### JUUL Utilized Viral Marketing Tools to Turn Consumers, Especially Teenagers, Into JUUL Promoters

155.    Another key feature of JUUL's viral marketing campaign is the way in which JUUL effectively turned its customers into salespeople, multiplying exponentially the number of teenagers it was able to influence.

156.    Within a few months of the JUUL's commercial release in June 2015, a former JUUL executive reportedly told the New York Times that JUUL "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."

157.    To drive consumer participation in its ad campaign, JUUL peppered its advertising and social media posts with hashtags and trending topics unrelated to JUUL such as Mother's Day.

158.    By inviting the creation of user-generated content related to JUUL's age restricted product, JUUL invited the indiscriminate promotion of its ENDS on youth-filled social media platform.   An 18-year-old who posted a #JUULmoment, for example, would likely have followers who were under the legal age to purchase tobacco products, resulting in the sharing of a #JUULmoment-and the promotion of JUUL-to minors.

159.    Upon information and belief, because JUUL was almost certainly monitoring the uses of its hashtags, JUUL would have seen the tens of thousands of posts being made by minors.   But at no time however did JUUL take any serious steps to discourage the use of the JUUL hashtag by teenagers.

160.    Because JUUL is a trademark, JUUL could have stepped in and attempted to stop the use of its mark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL" with respect to such posts, and it could have shut down infringing accounts. It did not do so.

161.    In a similar vein, Defendant JUUL used the #JUUL branded hashtag in a significant number of its hashtagged posts on Instagram and Twitter, leading #JUUL to become the most popular JUUL-related hashtag.   Though JUUL has stopped marketing on social media platforms, the #JUUL branded hashtag it launched continues to spread and be used by JUUL users on social media platforms.

**JUUL Used Non-Age-Restricted Emails to Promote and Track Its Products**

162.    Upon information and belief, between 2015 and 2018, JUUL sent around 200 email promotions to customers and potential customers.   In addition, JUUL sent survey material. JUUL's email subscription list was not age-restricted and, until recently, users who

failed the age verification requirements on JUUL's purchase page were nevertheless added to JUUL's mailing list and emailed a coupon for a discount on a Starter Kit. The JUUL emails promoted retail locations, flavors, discounts, and "refer a smoker" programs. The emails also promoted JUUL's find-a-store locator.

### JUUL Allowed Third Parties to Use Its Trademark to Promote the Products to Underage Consumers

163. In 2017, an account named @JUULnation was established on Instagram. "JUULnation" includes Defendant's trademark "JUUL."

164. Upon information and belief, @JUULnation's Instagram posts included tips on how to conceal JUUL devices in school supplies.

165. @JUULnation also promoted the sale of JUULpods directly through Instagram.

166. @JUULnation used a branded hashtag to promote its posts: "#JUULnation." Like the account name "JUULnation," this hashtag contains the JUUL trademark.

167. Because Defendant JUUL closely monitored its own hashtags and hashtag marketing, Defendant JUUL knew that @JUULnation was promoting its hashtags. Defendant JUUL therefore also knew that @JUULnation was overtly promoting the unlawful purchase and use of JUUL products by minors, and that a significant portion of @JUULnation's followers were under the legal age to purchase tobacco.

168. Upon information and belief, instead of putting an end to JUULnation's youth-targeting activity, Defendant JUUL repeatedly promoted @JUULnation's hashtag, "#JUULnation," on Instagram in JUUL content. By promoting #JUULnation, JUUL effectively directed its followers to an entity that would continue to deliver youth marketing and

youth access to JUULpods at a time when JUUL was being pressured to tone down its marketing and take steps to restrict youth sales.

## JUUL Tracked the Efficacy of Its Youth Marketing

169.     Tracking the behaviors and preferences of youth under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products.

170.     Taking a page from the Big Tobacco playbook, upon information and belief, JUUL has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL products.  Moreover, modern technology has removed many of the hurdles that made youth tracking a difficult matter in decades past. With e-mail, social media and online forums, JUUL can track and monitor its target audience anywhere and at any time.

## JUUL Amplified Its Message using Off-Line Advertising to Ensure Consumers Were Blanketed with Non-Stop Messaging About Its Products

171.     JUUL did not limit its aggressive viral marketing to the internet.   To ensure that consumers - teenagers and adults - were constantly exposed to its ad campaign, JUUL placed its simple, consistent ads in numerous public spaces.

172.     JUUL also provided retailers with large posters to display in their store windows. Because JUUL took steps to ensure its products would be sold at gas stations and convenience stores, people would be presented with massive posters mimicking the simple, clean advertisements JUUL displayed on social media when engaging in routine activities, like buying gas or snacks.

173.    By saturating public spaces with its advertisements, JUUL not only increased the buzz around its product, but it made it more difficult for those addicted to quit.    In other words, by plastering public spaces with JUUL advertisements, JUUL ensured that those trying to quit would not be able to stop being reminded of the product, which in turn would trigger cravings, and increase the likelihood they would purchase the product again.

### JUUL Utilized a Pricing and Distribution Model Designed to Put the Product Within Reach of Youth and JUUL's Pricing Model Entices New Users, Including Youth and Non-Smokers

174.    Tobacco companies for years sold youth-brand cigarettes at lower prices that underage smokers could afford and used discounts and other promotions to ensnare underage smokers. JUUL is no different.    It not only designed a marketing campaign to reach young people and entice new smokers, but it priced its products in such a way to ensure they would buy them.

175.    A pack of four JUULpods, which, according to JUUL, is the equivalent of four packs of cigarettes, costs approximately $13-$20. JUUL's website charges $15.99 for a pack of JUULpods, or about $4 per JUULpod.    By contrast, a single pack of cigarettes in California costs approximately $8.

176.    Moreover, JUUL offers discounts to purchasers who refer others to purchase JUULpods or JUUL devices from JUUL.

177.    JUUL also offers discounts on JUULpods to individuals who sign up for JUUL's subscription service.    Included among those discounts are both straight price discounts (e.g., 15% off), and bulk/loyalty discounts (buy 5, get 1 free).

**JUUL Sought Out Retail Locations That Were Frequented by Its Target Audience and Displayed the Products in Arms' Reach**

178.    For years, JUUL made it difficult for smoke shops, vape shops and other age-restricted stores to carry its products, instead directing all of its product to gas stations, which historically are the worst offenders with respect to underage sales. JUUL knows that teenagers, those new to smoking, and those trying to quit their nicotine addiction are likely to frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL would increase the chances that these people would purchase the product.

179.    To further drive curiosity and interest, and make it so its target audience, and especially teenagers, would purchase JUUL products, JUUL instructed retailers to display the product in an unusual fashion. Whereas cigarettes and other tobacco products have long been kept behind the counter, JUUL designed display cases that would sit on store shelves. JUUL intentionally designed the clear display cases so that the bright white, sleek packaging and the flavors would catch consumers' eyes and make them interested in purchasing the product.

180.    JUUL knew that by asking retailers to display JUUL products separate from other tobacco products, and within arms' reach, it would also suggest to consumers that JUUL was more safe than traditional cigarettes and that it was not an addictive drug.

178.    Moreover, on information and belief, not only are many of JUUL's retail locations are non-age restricted gas stations, but it appears that the retailers are frequently in close proximity to high schools and colleges.

179.    On information and belief, JUUL's retail locations provide no signs warning or other indicators concerning the existence, danger, or amount of nicotine in JUUL products.

47

180.    On information and belief, JUUL products are not sold in pharmacies, which have the lowest rates of underage tobacco sales.

### JUUL Sold Its Products Through Its Website and Offered Enticing Discount Subscription Services

181.    JUUL owns and operates www.juullabs.com and www.juulvapor.com (the "JUUL Websites"), where it markets, advertises and sells its e-cigarettes and JUULpods.

182.    The JUUL Websites are a leading online marketing and distribution channel for e- cigarettes. JUUL partners with other online and brick-and-mortar providers to market, advertise and sell, via the JUUL Websites, e-cigarettes.

183.    Upon information and belief, when a consumer purchases a JUUL e-cigarette and/or JUULpods utilizing any of the JUUL Websites, he or she first chooses his or her desired e- cigarette style and color and nicotine pod flavor and color. After the consumer has input that information into the JUUL Websites, the JUUL Websites advertise to the consumer different e-cigarette styles and colors and/or a variety of nicotine pod flavors and colors. From Defendants' advertised e-cigarette and pod styles, consumers select a desired e-cigarette decorated in a style most appealing to the consumer, and/or one or more desired pod flavors, each of which has its own distinctive color. The JUUL Websites allow the purchaser to arrange automatic shipping of refill nicotine pods. Since 2015, JUUL has known that straw purchases of, e.g., 10 JUUL devices were being made for the purpose of resale to youth. JUUL also knew that its lax online age verification procedures allowed youth to purchase products directly from JUUL's website. By August 2017, when JUUL announced that it was increasing the age of purchase on its website to 21, JUUL had already entered agreements with numerous online vendors who would

sell JUUL products with no such age requirement. Thus, JUUL was able to outwardly present an air of corporate responsibility, knowing full well that youth sales would continue unabated.

**JUUL's Actions Have Created a Youth Vaping Epidemic**

184.    JUUL's marketing and product design efforts have been successful. Since its launch, JUUL is now the fastest growing e-cigarette in the country. Because the JUUL delivers more nicotine in a shorter amount of time than any other product, delivers that nicotine in a sweetened vapor that causes no irritation, and does so through a concealable device that can be consumed discretely in class, at home, and in the car, nicotine naive users frequently spiral into patterns of addiction with no historical precedent.

185.    Because JUUL's marketing turned the JUUL into a status symbol for teens, the acute nicotine addiction a JUUL fosters is frequently reinforced by the idea-which JUUL spread-that JUUL use is what "cool" popular kids do in high school. As a result, the medical community has found itself ill-equipped to develop a treatment for JUUL-addicted youth.

186.    The vaping epidemic caused by JUUL has swept the entire nation in a short period of time. In December 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent Electronic Nicotine Delivery System ("ENDS") vaping from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."

187.    FDA Commissioner Dr. Scott Gottlieb has described the increase in e-cigarette consumption as an "almost ubiquitous - and dangerous - trend" that is responsible for an "epidemic" of nicotine use among teenagers.

188.    As a result of Defendant JUUL's aggressive advertising to teenagers, there is an

epidemic of teen addiction. It has been reported by the New York Times that approximately 3.6 million middle and high school students are vaping regularly. See https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.

188.    In a statement issued by the FDA in November, 2018, the FDA noted that in 2016 and 2017, e-cigarette usage among high school students had been around 11 percent, but that in 2018, more than a quarter of high school students were regularly using e-cigarettes.

189.    Even more troubling are the challenges associated with getting kids to quit JUUL once they start.   JUUL's aggressive social media campaign puts JUUL advertisements before them every day, all day.   Those that want to stop thinking about it are faced with advertising when engaging in their regular activities.    And even while JUUL has purportedly stopped advertising on social media, its hashtags, imagery, and impact live on.

### JUUL Was Able to Undo Decades of Progress Reducing Teen Smoking by Exploiting Regulatory Loopholes

190.    The teen vaping epidemic was by design, not by accident.

191.    When JUUL was first developed, the FDA's regulations on tobacco products were vague as to whether they applied to vaping devices.   Because the regulations did not explicitly identify electronic vaping devices that dispensed tobacco and nicotine as a regulated product, JUUL interpreted those regulations to mean that it could sell its dangerous products to anyone, regardless of their age, and that it did not have to comply with the advertising and labeling restrictions that restricted other tobacco companies.

192.    As other vaping companies began to enter the market, JUUL no doubt knew that this gray area was unlikely to stay gray for long.   Knowing that the clock was ticking, JUUL

went on a wild spree to get as many young people addicted as possible while it still viewed itself as "unregulated."   The aggressive advertising described above was designed not just to sell the products to teenagers, but to sell the product to as many teenagers as possible while it still had a plausible defense to any assertion that it was violating FDA regulations.   By hooking teens, JUUL not only ensured it would have loyal consumers for decades, but those teens would influence their friends.

193.    Moreover, by pumping social media platforms full of images of cool, young people having fun while JUULing, JUUL ensured that everyone from adults to young children would JUULing was a cool, fun, and safe activity.

194.    In 2017, the FDA announced that it would be taking steps to regulate vaping devices such as JUUL and other ENDS.  Regulations were proposed and ultimately went into effect in late 2018. But the damage was done.   Between 2017, use of vaping had shot up from 11% of high school users to 27.7%, no doubt due to the way in which JUUL's viral marketing campaign had multiplied-exactly as JUUL had intended in 2015.

### JUUL's Deal with Altria Reveals that JUUL's Goal Was Always About Increasing the Rates of Nicotine Addiction

195.    In December 2018, it was announced that tobacco giant Altria, which owns the Philip Morris company, took a 35% share in JUUL, which was valued at $38 billion.

196.    Altria, which is a party to the Master Settlement Agreement, must abide by strict rules to ensure that it is not directing its tobacco products to children. But JUUL is not a party to that agreement. Thus, by providing Altria a controlling share, JUUL has single-handedly blown up that agreement and put even more kids at risk.

197.    As a result of the acquisition, Altria now has access to JUUL's years of social media metrics, youth survey responses, and a vast amount of other data, which Altria would not have been able to acquire on its own due to the Master Settlement Agreement. And Altria will almost certainly have JUUL's customer list, built up from years of selling its products on its website.

198.    Moreover, the deal ensures that even though JUUL is now subject to regulations, it will gain access to Altria's lobbying and marketing expertise, which it has honed through decades of mining regulatory loopholes to push its nicotine products.

199.    JUUL will also benefit from Altria's market dominance. For example, as part of the deal, Altria agreed to give JUUL top-shelf space so that Juulpods will be displayed next to Marlboro, the market leader.

## CLASS REPRESENTATION ALLEGATIONS

200.    Plaintiff brings this action against Defendants on behalf of herself and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Plaintiff is a member of the proposed class. The proposed Class is defined as follows:

> All persons under the age of 18, who purchased and/or consumed, in the State of Tennessee, a JUUL e-cigarette and/or JUULpods.

> All residents of Tennessee who purchased and/or consumed, in the State of Tennessee, a JUUL e-cigarette and/or JUULpods.

> All persons under the age of 18, who purchased and/or consumed, in the State of Tennessee, a JUUL e-cigarette and/or JUULpods, illegally.

> All persons under the age of 18, who purchased and/or

consumed, in the State of Tennessee, a JUUL e-cigarette and/or JUULpods, who became addicted and are now adults.

All persons under the age of 18, who purchased and/or consumed, in the State of Tennessee, a JUUL e-cigarette and/or JUULpods, illegally, who became addicted and are now adults.

201.    Plaintiffs reserve the right to propose subclasses or modify the above class definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

202.    This action has been brought and may properly be maintained as a class action against the Defendants pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

203.    Numerosity:  Plaintiff does not know the exact size of the Class, but they are each composed of more than 500 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

204.    Plaintiff is informed and believes that the potential class members number in the thousands.   The precise number of class members and their addresses are unknown to the Plaintiff; however, they are readily available from the Defendants' records.   Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary by the Court) by published notice.

205.    Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each Class Member's claim derives from the false, deceptive, unlawful and/or unfair statements and omissions that led Class Members to believe

53

that: (a) JUUL E-cigarettes and JUULpods were less addictive than traditional cigarettes; (b) JUUL products could be used without negative health consequences, and (c) they would be able to stop using and purchasing JUUL products "anytime."  Class Member claims also derive from common questions of law and fact related to JUUL products falsely advertised as non-addictive.  The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each Class Member to recover.  Among the questions of law and fact common to the class are:

a.    Whether Defendants' advertising and marketing regarding the JUUL E- cigarette and JUULpods were likely to deceive Class Members or were unfair;

b.    Whether Defendants intentionally omitted material information from its advertising and marketing materials;

c.    Whether Defendants unfairly, unlawfully and/or deceptively induced Class Members to purchase JUUL E-cigarettes and/or JUULpods using the promise that they would be able to stop purchasing JUULpods "anytime";

d.    Whether the JUUL e-cigarette is defective;

e.    Whether Defendants knew or should have known about the JUUL's defect, and, if yes, how long Defendants has known of the defect;

f.    Whether the defective nature of the JUUL e-cigarette constitutes a reasonable fact consumer would have considered in deciding whether to use or purchase JUUL products;

g.    Whether JUUL had a duty to disclose the defective nature of JUUL

54

e- cigarettes to Plaintiffs and Class Members;

h.      Whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the JUUL e-cigarettes are defective and/or not merchantable;

i.      Whether JUUL had a duty to warn of the risks its products pose;

j.      Whether Defendants breached its duty to warn of the risks its e-cigarettes pose;

k.      Whether the JUUL e-cigarette is unfit for the ordinary purpose for which they were used, in violation of the implied warranty of merchantability;

l.      Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

m.      The amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

n.      Whether Defendants engaged in unlawful, unfair or deceptive business practices, as alleged herein;

o.      Whether Defendants made unlawful and misleading representations or material omissions with respect to JUUL products;

p.      Whether Defendants unlawfully marketed to minors;

q.      Whether Defendants have been unjustly enriched by their conduct;

r.      Whether Class Members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief;

s.    Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief; and

t.    Whether punitive damages should be awarded.

206.    Typicality: Plaintiffs' claims are typical of the class because each Plaintiff was misled into: (a) purchasing a highly addictive nicotine product due to Defendants' false advertising and unfair business practices; and/or (b) substituting addiction to vaporized nicotine salts in place of addiction to nicotine from cigarette smoking.    Thus, Plaintiff and Class Members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law.    The injuries and damages of each Class Member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

207.    Adequacy: Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain.    Plaintiffs also has no interests that are in conflict with or antagonistic to the interests of Class Members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Classes.    No conflict of interest exists between Plaintiffs and Class Members hereby, because all questions of law and fact regarding liability of Defendants are common to Class Members and predominate over any individual issues that may exist, such that by prevailing on his/her own claim, Plaintiffs necessarily will establish Defendants' liability to all Class Members.    Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of

their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

208.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action.   The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties.   Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender.   Furthermore, as the damages suffered by each individual Class Member may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

209.    Nexus to Tennessee: The State of Tennessee has a special interest in regulating the affairs of corporations that do business here and persons who live here.   There is a substantial nexus between Defendants' unlawful behavior and Tennessee such that the Tennessee courts should take cognizance of this action on behalf of a class of individuals who reside in Tennessee and the United States.

210.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

211.    Plaintiff will fairly and adequately protect the interests of the class. Her interests do not conflict with those of the class, and she is represented by counsel competent and

experienced in complex class action litigation.

212.    Additionally, the damages or other financial detriment suffered by individual class members are relatively small compared to the burden and expense that would be required to individually litigate each of the class members' claims against Defendants and it would be impracticable for the class members to individually seek redress for the Defendants' wrongful conduct.

213.    Even if the members of the class could afford individual litigation, given the expected size of the class, separate litigation of each class member's claims against Defendants would create the potential for inconsistent and/or contradictory judgments, and cause delay and increase the expense for all parties and the court in adjudicating the claims against Defendants. Conversely, a class action will prevent far fewer management difficulties, provide the benefits of a single adjudication, conserve time, effort and expense, employ comprehensive and cohesive supervision by a single court, and provide for a forum of small claimants.

214.    The prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members which would establish incompatible standards of conduct for the Defendants.  Moreover, the likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

215.    The prosecution of separate actions by individual class members would create a risk of adjudication that may, as a practical matter, be dispositive of the interest of other class members not parties to the adjudication or would substantially impair or impede their ability to protect their interests.

58

216.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the members of the class as a whole.

217.    Any difficulties in management of the case as a class action are outweighed by the benefits that a class action has to offer with respect to disposing of common issues of law and fact on issues affecting a large number of litigants.

## CAUSES OF ACTION

### Count One
### Negligent and Reckless
### Misconduct (Class Action and
### Individual Claim)

218.    Plaintiff incorporates and re-alleges by reference each of the allegations set forth in the preceding paragraphs as though each were fully set forth herein.

219.    Defendants had a duty to act in a reasonable and prudent manner when engaging in business practices including the sale and distribution of JUULpod and e-cigarette products.

220.    Defendants' actions as described herein were in breach of that duty.

221.    Plaintiff and all class members were proximately damaged as a result of said breach and have suffered loss and damage, all of which was reasonably foreseeable based upon Defendants' wrongful acts and omissions.

222.    Defendants' actions were reckless, willful and wanton and Plaintiff and all class members are entitled to an award of punitive damages as provided by the laws of the State of Tennessee to punish Defendants and deter similar misconduct in the future.

**Count Two**
**Tort of Outrage**
**(Class Action and Individual Claim)**

223.    Plaintiff incorporates and re-alleges by reference each of the allegations set forth in the preceding paragraphs as though each were fully set forth herein.

224.    The conduct of Defendants as described herein and more fully reflected in the evidence of record were so outrageous and intolerable as to exceed the bounds of decency and Defendants acted recklessly when they were substantially certain that emotional distress would result from their misconduct.

225.    As a proximate result of Defendants' misconduct, Plaintiff and all class members are entitled to compensatory damages.

226.    Defendants' actions were reckless, willful and wanton, and Plaintiff and all class members are entitled to an award of punitive damages as provided by the laws of the State of Tennessee to punish the Defendants and deter similar misconduct in the future.

**Count Three**
**Unjust Enrichment**
**(Class Action and Individual Claim)**

227.    Plaintiff incorporates and re-alleges by reference each of the allegations set forth in the preceding paragraphs as though each were fully set forth herein.

228.    By means of Defendants' wrongful conduct alleged herein, Defendants knowingly sold JUUL Products to Plaintiff and members of the Class in a manner that was unfair, unconscionable, and oppressive.

229.    Defendants knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.   In so doing, Defendants acted with conscious disregard for

the rights of Plaintiff and members of the Class.

230.    As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

231.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

232.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits it received, without justification, from selling JUUL Products to Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner.  Defendants' retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

237.    The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Class.  Defendants should be compelled to return in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by them.

238.    Plaintiff and members of the Class have no adequate remedy at law.

239.    By participating in the above-described business practices, each Defendant was unjustly enriched.

**Count Four**
**Fraud**
**(Class Action and Individual Claim)**

240.    Plaintiff incorporates and re-alleges by reference each of the allegations set forth in the preceding paragraphs as though each were fully set forth herein.

241.     On the dates set forth in this Complaint, and within the three years prior to the filing of this lawsuit, Defendants fraudulently and deceptively sold JUUL products to Plaintiff and members of the Class as non- addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendants knew it to be untrue.   On those same dates, Defendants fraudulently and deceptively failed to disclose to Plaintiff and members of the Class that the JUUL nicotine salts they were purchasing were highly addictive in nature, making it extremely difficult for Plaintiff and members of the Class to cease purchasing JUULpod refills. On the same dates, Defendants fraudulently and deceptively informed Plaintiff and members of the Class that they would be able to cease purchasing JUULpods "anytime," when they knew it to be untrue.   On those same dates, Defendants fraudulently and deceptively failed to disclose to Plaintiff that the nicotine benzoate salts in JUULpods delivered nicotine to blood plasma at higher rates, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with cigarettes or other E-cigarette products. Defendants made each of these misrepresentations and omissions to Plaintiff and those similarly situated as Plaintiff.

242.     Each of these misrepresentations and omissions were material at the time they were made.   In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and those similarly situated, as to whether to purchase a JUUL E-cigarette and JUULpod.   Defendants had a fiduciary duty to accurately provide this information to Plaintiff, and those similarly situated.   In not so informing Plaintiff, and those similarly situated, Defendants breached its duty to each of them. Defendants also gained financially from, and as a result of, its breach.

243.    Plaintiff, and those similarly situated, relied to their detriment on Defendants' fraudulent omissions.  Had Plaintiff, and those similarly situated, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation not purchasing a JUUL E-cigarette or JUULpod(s) and not subscribing to Defendants' "autoship" service.

244.    Plaintiff allege the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

245.    *Who*: Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes from Plaintiff and Class Members while simultaneously disclosing false or misleading evidence concerning nicotine content.  Defendants also actively concealed the benzoic acid content of the JUUL e-cigarettes, while knowing that benzoic acid played a central role in determining the physiological effects of JUUL e-cigarettes.  Defendants also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendants did so without notifying Plaintiff.  Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at JUUL or PAX responsible for such decisions.

246.    *What*: Defendants knew, or was negligent or reckless in not knowing, that the JUUL e-cigarettes were likely to aggravate nicotine addiction in smokers and posed extreme risks of addiction to children and made misrepresentations about the risks, effects, operation, content, and other attributes of JUUL e-cigarettes.  These misrepresentations include both omissions of nicotine warning, omission of facts regarding the increased potency and addictiveness of nicotine salts, misrepresentations about the amount of nicotine in JUULpods

and the absorption thereof through use of JUUL, and misrepresentations of using JUUL as a fun, healthy activity for the young, without disclosing the long-term health effects and the actual feeling of being addicted to nicotine.

247.    *When*: Defendants concealed material information regarding the effect of JUUL e- cigarettes at all times and made representations from the time when the JUUL e-cigarette was announced to this day.   Defendants still has not disclosed the truth about JUUL e-cigarettes. Defendants have amplified and cemented these misrepresentations in the minds of the public through its unprecedented social media efforts, the full scope of which is not yet fully known.

248.    *Where*: Defendants concealed material information and made misrepresentations regarding the true nature of JUUL e-cigarettes' nicotine formula on JUUL's websites, interviews with the media, promotional materials, and through social media.   Plaintiff is aware of no document, communication, or other place or thing in which Defendants discloses consistent or truthful statements about JUUL e-cigarettes' potency or its actual nicotine content. Such information is not disclosed on JUUL's website or in any marketing materials or advertising materials.

249.    *How*: Defendants concealed critical information from Plaintiff and Class Members concerning the potency and effects of JUUL use, or made representations about the nicotine content and potency of the JUUL e-cigarettes that were false or misleading. Defendants actively concealed the truth about the real impact of JUUL e-cigarette use from Plaintiff and Class Members at all times, even though it knew such information would be important to a reasonable consumer, and Defendants promised in JUUL's marketing materials that the JUUL e-cigarettes have qualities that they do not have.

64

250.    *Why*: Defendants actively concealed material information about the potency of JUUL e-cigarettes for the purpose of inducing Plaintiff and Class Members to purchase and/or use JUUL e-cigarettes.   Had Defendants disclosed the truth-that the JUUL e-cigarette was, by design, more physically addictive than cigarettes, for example in its advertisements or other materials or communications, Plaintiff and Class Members (all reasonable consumers) would have been aware of this fact, and would not have bought JUUL e-cigarettes or would have used them in a way that posed fewer risks of creating or aggravating nicotine addiction.

251.    More information about each of these elements is provided in greater detail in the body of this complaint, above.

252.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiff and those similarly situated to alter their positions to their detriment.

254.    Plaintiff and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and/or omissions, and, accordingly, were damaged by the Defendants.

255.    As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff, and those similarly situated, have suffered damages in an amount equal to: (a) the amount that Defendants charged them; and (b) the amount they paid in excess of what they would have paid for a less addictive e-cigarette and refill cartridges containing nicotine in a non- salt formulation.

256.     Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that they would cause loss and harm to Plaintiff, and those similarly situated.

**Count Five**
**Nuisance**
**(Class Action and Individual Claim)**

257.     The Plaintiffs incorporates and re-alleges by reference each of the allegations set forth in the preceding paragraphs as though each were fully set forth herein.

258.     The Defendants herein have engaged in systematic deceptive marketing and promotion of JUUL products, as described above. This misconduct has created, caused and/or substantially contributed to the public nuisance.

259.     Defendants' misconduct as set forth above has created or contributed to a substantial and unreasonable interference with rights common to the general public, including the right to be free of an unreasonable interference with public health, safety and peace.

260.     Defendants' interference with the public health, safety and peace through their misconduct has been unreasonable, as established by the following circumstances as more fully alleged previously herein:

a.     Defendants' misconduct is responsible for minors becoming addicted to nicotine and significantly interfered with public health, safety and peace;

b.     Defendants' misconduct is responsible for adults continuing to be addicted to nicotine and to become increasingly dependent on nicotine, rather than weaning

themselves from nicotine, and significantly interfered with public health, safety and peace;

c.  Defendants' misconduct has produced a permanent or long-lasting effect and will continue unless the Defendants reveal the complete truth about their products, including the serious safety and health risks posed by JUUL products, that JUUL pods and JUUL devices deliver more nicotine into the bloodstream than a cigarette, that each JUUL pod contains more nicotine than a pack of cigarettes, and that more than 10 puffs of a JUUL are equivalent to smoking a cigarette. Defendants knew or had reason to know that their misconduct has had and continues to have a significant adverse impact on public health, safety and peace;

d.  Defendants' interference with rights common to the public is and was unreasonable based on the totality of the circumstances.

261.  The unreasonableness of Defendants' conduct and the resulting substantial harm imposed and the infringement of their rights is evident from the gravity of the harm, e.g., nicotine addiction and its negative health consequences, and from the accompanying serious effects that interfered with and degraded, and continues to interfere with and degrade, the public health and safety.

262.  The deterioration of public health and safety caused by the JUUL products tears at the social and economic fabric of society; its impact is not limited to JUUL consumers adversely affected by the negative health consequences of nicotine and the other JUUL ingredients, but have been socialized and ultimately borne by the community as a whole.

263. Defendants' JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to its users, including teenage users. Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems. Nicotine adversely affects the heart, eyes, reproductive system, lung, and kidneys. Exposure to nicotine produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Because vaping introduces foreign substances into the lungs, prolonged use of JUUL products may produce chronic obstructive pulmonary disease, just like traditional cigarette smoke. Vaping also triggers immune responses associated with inflammatory lung disease.

264. The negative effects of addicting minors to nicotine and continuing the nicotine addictions of adults who are attempting to wean themselves from nicotine on the public health, safety and peace are substantial and community-wide, and include, but are not limited to, increased costs for medical care, increased health insurance costs for members of the public, an increased strain on the medical system which affects the quality and cost of medical care available to the public, reduced productivity and economic output of JUUL consumers because of time spent vaping, which affects the economy as a whole, the cost to society of supporting nicotine ingestion cessation programs, increased life insurance rates for all, increased social services, increased disability benefits and others.

265. Defendants had sufficient control over, and responsibility for, the public nuisance they created, as alleged more fully herein. Defendants were in control of the "instrumentality" of the nuisance, including the process of marketing and promotion and creation and maintenance of

the demand for JUUL products at all relevant times, which included control of the misleading representations they conveyed through marketing and product promotion.

266.  Defendants could have ameliorated, at least in part, the public nuisance by ceasing their improper marketing of JUUL products and their dissemination of misleading information about the safety and efficacy of their products, and by disseminating corrective statements that informed consumers and others about the true risks of JUUL products.

267.  Defendants are not immune from public nuisance claims because they produced and marketed otherwise and/or allegedly legal products.  Lawful conduct of businesses, like lawful conduct of individuals, has long been held to constitute a public nuisance if it unreasonably interferes with public health, safety, or peace. In any event, Defendants' conduct- and the deceptive marketing and product promotion and misrepresentations and omissions embodied therein - was unlawful.

268.  The injury, damage and costs to society from Defendants' misconduct were both significant and either known or wholly foreseeable to Defendants. While reaping millions of dollars in revenues and profits through their misconduct, the Defendants improperly shifted the burden, harm and costs of their public nuisance to the community as a whole, and its residents, which the community has and will continue to have to address to its detriment.

269.  Plaintiffs have suffered and continue to suffer special harm that is different in kind and degree from that suffered by individual residents of Tennessee as alleged herein.

270.  Plaintiffs sue in their public capacity for all appropriate injunctive and mandatory relief to abate the ongoing public nuisance, restore the public health, safety and peace, and recover all appropriate damages, expenses, costs and fees.

271.  Plaintiffs also sue in their private capacity to recover the additional costs they have incurred or will incur as a result of Defendants' nuisance and other appropriate damages, expenses, costs and fees.

272. Defendants also are liable for punitive damages to reflect the aggravating circumstances of their intentional, willful, wanton, malicious and oppressive conduct as set forth herein.  Defendants acted or failed to act knowingly, willfully and deceptively, with gross negligence, maliciously, and/or wantonly with conscious disregard of the public's health, safety, and welfare.

### Count Six
### Breach of Implied Warranty of Merchantability
### (Class Action and Individual Claim)

273.  The Plaintiffs incorporates and re-alleges by reference each of the allegations set forth in the preceding paragraphs as though each were fully set forth herein.

274.  The Uniform Commercial Code § 2-314, as adopted in Tennessee within Section 47-2-314 of the Tennessee Code Ann., as amended, provides in pertinent part that, unless excluded or modified, a warranty that the goods shall be merchantable as implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

275.  To be "merchantable," goods must be adequately contained, packaged, and labeled as the agreement may require and conform to the promise or affirmations of fact made on the container or label if any.

276.  The implied warranty of merchantability included with the sale of each JUUL product meant that Defendants warranted that its devices and pods would be merchantable, fit for the ordinary purposes for which they are used, pass without objection in the trade, be of fair

70

average quality, and conform to promises and affirmations of fact made on the container and label. This implied warranty of merchantability is part of the basis for the bargain between Defendants and Plaintiffs and Class members.

277. At the time of delivery however, Defendants breached the implied warranty of merchantability because its devices and pods were defective as alleged above, posed serious safety risks at the time they were sold, would not pass without objection, were not equivalent in terms of nicotine content, pharmacokinetics, and puff-count to cigarettes, and failed to conform to the standard performance of like products (cigarettes and e-cigarettes) used in the trade.

278. Defendants are merchants with respect to the good which were sold to Plaintiff and Class members, and there was an implied warranty that those goods were merchantable at the time of the sale.

279. JUUL e-cigarettes are not fit for their intended purposes of offering an alternative to cigarettes because JUUL e-cigarettes, when used as intended or reasonably foreseeable, worsen or aggravate users' underlying nicotine addiction.

280. As a direct and proximate result of Defendants' breach of their implied warranties, Plaintiffs and Class members have been damaged and seek damages in an amount to be determined at trial.

**Count Seven**
**Strict Product Liability –  Failure to Warn**
**(Class Action and Individual Claim)**

281. The Plaintiffs incorporates and re-alleges by reference each of the allegations set forth in the preceding paragraphs as though each were fully set forth herein.

282. Defendants manufactured, distributed and sold JUUL devices and JUUL pods. Defendants were aware that the JUUL devices, when used in conjunction with the JUUL pods, had potential risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution and sale of JUUL devices and JUUL pods.

283. The JUUL devices and pods were designed, manufactured and sold by Defendants in the regular course of business and were expected to and did reach Plaintiffs and Class members without substantial change in the condition in which they were manufactured, sold and distributed.

284. Plaintiffs and Class members received the JUUL products in the same conditions in which they were sold, and used their JUUL devices and pods in a manner reasonably intended by Defendants.

285. Defendants had no reason to believe that consumers of its JUUL products would be aware of the foreseeable harm associated with use of them.

286. The risks and defects of the JUUL products is unknowable and unacceptable to the average or ordinary consumer. The ordinary consumer would not reasonably anticipate the danger that the JVUL products posed.

287. The use of JUUL devices and JUUL pods presented a substantial danger of causing nicotine addiction when a JUUL device was used or misused with a JUUL pod in an intended or reasonably foreseeable way.

288. At all times relevant herein, the JUUL devices and JUUL pods failed to contain adequate warnings or instructions about a dangerous condition that the Defendants knew or reasonably should have known about.

289. Plaintiffs and Class members would not have recognized this dangerous condition and the potential risks of using a JUUL device with a JUUL pod because Defendants intentionally downplayed, misrepresented, or failed to warn of the risks of nicotine addiction that the JUUL device and JUUL pods posed and failed to disclose and warn that the product contained nicotine, the amount of nicotine or the absorption rates of that nicotine.

290. Defendants failed to adequately warn or instruct foreseeable users of JUUL devices and JUUL pods of the risks of nicotine addiction that their products posed.

291. As a direct and proximate result of the Defendants inadequate warning rendering the product unreasonably dangerous to the user.

292. As a direct and proximate result of Defendants' failure to warn of the defective and unreasonably dangerous condition and design of the JUUL products and the risk they posed, Plaintiffs and Class members suffered property damage and other incidental and consequential damages.

293. Defendants' failure to warn and lack of sufficient instructions or warnings were a substantial factor in causing harm that resulted to Plaintiffs.

**Count Eight**
**Violation of the Tennessee Products Liability Act**
**(Class Action and Individual Claim)**

294. The Plaintiffs incorporates and re-alleges by reference each of the allegations set forth in the preceding paragraphs as though each were fully set forth herein.

73

295. Defendants' JUUL products are defective and unreasonably dangerous when manufactured and placed in commerce in Tennessee.

296. Defendants failed to warn consumers that the JUULpods pose a danger to children and young adults and Defendants are strictly liable under the Tennessee Products Liability Act of 1978. Tenn. Code Ann. §§ 29-28-101 to -108 (2000).

297. The unreasonably dangerous condition of JUULpods and the failure to warn proximately caused Plaintiff and class members' injury and damage.

298. Punitive damages are warranted because Defendants acted intentionally and recklessly in manufacturing, marketing, and selling the JUUL products.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs individually and on behalf of the class members that she seeks to represent, requests that this Court:

1.      Prohibit and restrain Defendants and/or their agents or another acting on their behalf from altering, deleting or destroying any documents or records, which could be used to identify the members of the class;

2.      Enter an Order certifying the proposed class, designating Plaintiff as class representative, and appointing Plaintiff's counsel as counsel for the class;

3.      Award compensatory and punitive damages as permitted under Tennessee law in an amount to be determined and enter judgment against Defendants and award Plaintiff and members of the class;

4.      Award restitution, including, without limitation, disgorgement of all

profits and unjust enrichment obtained by Defendants as a result of their unlawful, unfair, and fraudulent business practices and conduct alleged herein;

5.    Permanently enjoin Defendants from engaging in the unlawful conduct and practices described herein;

6.    Enter an Order for declaratory relief providing that any purported arbitration agreement between the Plaintiffs and the Class members and Defendants is void and unenforceable;

7.    Award prejudgment and post-judgment interest;

8.    Award attorneys' fees, expenses, and the costs of this action; and

9.    Award all other and further relief as it deems necessary, just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL**

**JOHN SCOTT EMIDY,**
**Individually and on behalf**
**of those similarly situated**

By*: /s/ Owen P. Lalor* _____
       Owen P. Lalor (TB No. 8977)

OF COUNSEL:

**LALOR ABY& MORGAN, PLLC**
R. Keith Morgan (MSB#10319)
Owen P. Lalor (MSB #1778 TN # 8977)
230 Trace Colony Park Drive, Suite 4
Ridgeland, MS 39157
Phone:  601-898-2000
kmorgan@lalorbaileyaby.com
hbailey@lalorbaileyaby.com
olalor@lalorbaileyaby.com

75